**AFFIDAVIT OF MELANIE NATHAN**
**RESPONDENT: CONROY CONDECORE**
**File No.: A 209 102 082**
**COUNTRY OF ORIGIN: JAMAICA**

**COUNTRY CONDITIONS FOR ESWATINI**

I, Melanie Nathan, hereby declare under penalty of perjury of the laws of the United States that the following statements are true and correct to the best of my knowledge:

## I. INTRODUCTION:

1. I submit this affidavit in my capacity as a country conditions expert on refugee protection systems throughout Africa, including Southern Africa, and on the treatment of LGBTQI+ individuals in African countries. My qualifications are summarized below, and my curriculum vitae is attached as Addendum "A."

2. This affidavit evaluates the legal and practical operation of Eswatini's immigration, refugee protection, and asylum framework as it pertains to a non-Swazi national whom the United States seeks to transfer to Eswatini pursuant to diplomatic assurances. Specifically, I assess whether Eswatini presently provides meaningful access to protection, lawful immigration status, effective procedural safeguards, and practical protection from persecution and refoulement for an individual who arrives without citizenship, lawful immigration status, recognized refugee status, or any pre-existing legal right to reside in the country.

3. This affidavit also addresses the particular risks faced by a gay man transferred to Eswatini under circumstances in which homosexuality remains subject to profound societal stigma and legal disapproval. Consensual same-sex sexual conduct between men continues to be criminalized through the retained colonial-era common law offence of sodomy, a prohibition that is also reflected in aspects of Eswatini's criminal procedural framework. Although recent prosecutions appear to be uncommon, the continued existence of the offence carries significant legal and practical consequences. In my professional opinion, the persistence of criminalization reinforces societal prejudice, legitimizes discrimination, discourages LGBTQI+ persons from seeking police protection or other state assistance, and contributes to an environment in which violence, abuse, extortion, and other forms of mistreatment may occur with diminished accountability.

4. This affidavit also considers the Respondent's individual circumstances, including his criminal history, insofar as they may affect his ability to obtain refugee protection, lawful immigration status, and effective state protection in Eswatini. In particular, I assess the potential implications of Eswatini's refugee exclusion provisions, the likelihood of heightened scrutiny during any refugee status determination process, and the practical impact that disclosure of the Respondent's criminal history may have upon his safety, social acceptance, and vulnerability within the legal and societal environment described herein.

5. It is my professional opinion, stated to a reasonable degree of expert certainty and based upon my review of Eswatini's legal framework, current country conditions, United States Department of State reporting, United Nations High Commissioner for Refugees (UNHCR) documentation, reports of international and regional human rights organizations, and my

professional experience researching refugee protection systems throughout Africa, that Eswatini does not presently demonstrate the legal, institutional, or practical capacity to provide effective protection to an involuntarily transferred third-country national in the Respondent's circumstances. Although Eswatini has enacted refugee legislation and is a party to the principal international refugee instruments, the available evidence raises substantial concerns regarding the practical operation of its protection system, including the absence of a demonstrated pathway to lawful immigration status, reports of prolonged detention of recent third-country transferees, limited procedural safeguards, and inadequate evidence that transferred individuals are afforded meaningful access to the country's refugee determination process.

6. It is further my opinion that these deficiencies cannot be assessed in isolation. Rather, where the individual concerned is a gay man, the legal, social, and institutional vulnerabilities associated with sexual orientation intersect with the uncertainties surrounding immigration status, detention, and access to protection, creating a cumulative risk that is materially greater than any single factor considered independently. It is this intersection of vulnerabilities that forms the basis of my opinions in this affidavit.

7. My opinions are confined to the country conditions, legal framework, and practical operation of Eswatini's immigration, refugee protection, and detention systems, together with the treatment of LGBTQI+ individuals within that environment. Specifically, my opinion is directed to whether Eswatini presently possesses the legal, institutional, and practical capacity to function as a receiving country for a non-Swazi national transferred there by the United States, including whether it can provide meaningful access to protection, lawful immigration status, effective procedural safeguards, protection against refoulement, and a durable legal solution. My opinion further addresses whether a gay man, by reason of his sexual orientation and the legal and social conditions affecting LGBTQI+ persons in Eswatini, faces additional risks that materially affect the availability of such protection. I do not offer opinions regarding the Respondent's credibility, the merits of his underlying protection claim, or legal issues reserved for determination by this Court.

**II. Qualifications**

8. I hold a post-graduate LL.B. degree from the University of the Witwatersrand (WITS) Law School, Johannesburg, South Africa (1980). I was admitted as an attorney of the Supreme Court of South Africa in 1982 following completion of my articles of clerkship and the South African Bar Examination. Since immigrating to the United States in 1985, where I am now a naturalized citizen, I have devoted nearly four decades to human rights advocacy, humanitarian protection, and policy work concerning vulnerable and forcibly displaced populations, particularly throughout Africa.

9. I am the Founder and Executive Director of the African Human Rights Coalition (AHRC), established in 2014. AHRC provides humanitarian assistance, emergency protection, country conditions research, advocacy, and expert analysis for individuals fleeing persecution across Africa, with particular expertise regarding LGBTQ persons, gender-based violence, and other vulnerable populations seeking international protection. My work regularly involves refugee protection systems, immigration detention, resettlement processes, and the practical operation of asylum systems throughout Africa.

10. My work extends across East, West, Central, and Southern Africa, including countries such as Uganda, Kenya, Tanzania, Rwanda, Burundi, Ethiopia, South Sudan, Ghana, Nigeria, Senegal, Sierra Leone, Guines, The Gambia, Cameroon, South Africa, Eswatini, Lesotho, Zimbabwe, Zambia, Malawi, Namibia, Angola, Mauritania and Niger. I work directly with survivors of persecution, local human rights organizations, attorneys, medical professionals, community leaders, traditional leaders, and refugee protection actors, including UNHCR and civil society organizations operating throughout the region.

11. Through AHRC, I maintain ongoing communication with trusted local human rights partners and regional contacts who assist in verifying incidents of persecution, documenting country conditions, and facilitating emergency protection for displaced persons. My work also requires continual assessment of refugee reception systems, host-country protection mechanisms, detention practices, and the practical implementation of refugee law throughout Africa.

12. I have authored more than 150 expert country conditions reports and affidavits and have been qualified repeatedly as an expert witness in immigration and refugee proceedings in the United States and internationally. My opinions have addressed conditions affecting LGBTQ persons, political opinion claims, religion, ethnicity, gender-based violence, refugee protection systems, and broader human rights conditions across numerous African jurisdictions.

13. My work has included participation in UNHCR's Global Roundtable on Protection and Solutions for LGBTIQ+ People in Forced Displacement, presentations for UNHCR concerning protection of LGBTQ refugees, consultation with governments, academic institutions, and international organizations, and ongoing research regarding refugee protection systems and forced displacement throughout Africa.

14. In addition to my broader regional work, I have ongoing professional engagement with human rights conditions in Eswatini. Through the African Human Rights Coalition, I am currently working with several advocates focused on conditions affecting LGBTQI+ persons in Eswatini, including advocates based in the United Kingdom and within the region, concerning protection pathways and durable solutions for individuals facing persecution. AHRC also maintains trusted local contacts ("ambassadors") in Eswatini who assist in verifying incidents, monitoring conditions on the ground, and facilitating emergency support where possible. Our work has included responding to reports involving the disappearance and suspected persecution of LGBTQI+ individuals in Eswatini, as well as assessing available protection mechanisms and humanitarian responses.

15. My opinions in this declaration are based upon my education, nearly four decades of professional experience, direct engagement with refugee protection systems throughout Africa, review of authoritative governmental and nongovernmental sources, and my continuing work with asylum seekers, refugees, humanitarian organizations, and regional experts throughout the continent.

## III. Sources and Methodology

16. My opinions and conclusions in this affidavit are based upon a combination of my professional experience, ongoing research, and systematic review of primary and secondary sources concerning Eswatini, refugee protection systems in Africa, and the treatment of LGBTQI+

individuals. In preparing this affidavit, I reviewed relevant legislation governing refugee protection and immigration in Eswatini; reports and documentation issued by the United States Department of State, the United Nations High Commissioner for Refugees (UNHCR), and other United Nations bodies; reports by international and regional human rights organizations; academic literature; governmental publications; and reputable independent journalism concerning recent third-country transfers to Eswatini, detention practices, and the operation of Eswatini's refugee protection system.

17. My opinions are further informed by my nearly four decades of professional experience researching country conditions throughout Africa; my work with forcibly displaced persons seeking international protection; my continuing engagement with refugee protection systems across the continent; and my direct communication with regional human rights advocates, refugee protection actors, and trusted local contacts, including those working on matters affecting LGBTQI+ persons in Eswatini. Where appropriate, I have considered both the formal legal framework and its practical implementation, recognizing that the existence of legislation does not necessarily reflect conditions experienced in practice.

18. In reaching the opinions expressed herein, I considered whether reliable information exists that materially contradicts the conclusions contained in this affidavit. Where competing information exists, I have assessed its reliability and consistency with the broader body of available evidence. My opinions are based upon the totality of the information presently available to me and are expressed to a reasonable degree of expert certainty.

19. This affidavit has been prepared under expedited circumstances due to the imminent nature of the Respondent's proposed transfer. It is therefore intended to address the issues presently before the Court concerning Eswatini's capacity to provide effective protection to an involuntarily transferred third-country national, rather than to serve as an exhaustive survey of all country conditions in Eswatini. Nevertheless, the opinions expressed herein reflect the same methodology and professional standards that I apply in preparing my comprehensive country conditions reports.

**IV. The Available Evidence Does Not Demonstrate Effective Protection for Third-Country Transferees**

20. I understand that the Respondent's proposed transfer is based, in part, upon diplomatic assurances provided by the Government of Eswatini regarding the treatment and protection of individuals transferred from the United States. I have been asked to evaluate whether the presently available country information demonstrates that Eswatini possesses the legal, institutional, and practical capacity to implement those assurances and provide effective protection to a non-Swazi national involuntarily transferred to its territory.

21. In my professional opinion, the presently available evidence does not demonstrate that Eswatini currently possesses such capacity. To the contrary, available reporting concerning the treatment of recent third-country transferees, the operation of Eswatini's refugee protection system, the absence of a demonstrated pathway to lawful status, and the reported detention of transferees at Matsapha Correctional Complex collectively raise substantial concerns regarding whether effective protection is presently available in practice. In my opinion, these

circumstances cast the reliability and practical implementation of the diplomatic assurances into substantial doubt.

22. Since mid-2025, the Government of Eswatini has accepted multiple groups of third-country nationals transferred from the United States pursuant to a bilateral removal arrangement. Public reporting establishes that these individuals are not citizens or nationals of Eswatini and were transferred despite having no pre-existing legal right to enter or reside in the country. [1]

23. According to Reuters, on July 8, 2026, an additional eleven individuals arrived in Eswatini from the United States, bringing the total number of third-country transferees to twenty-nine. Reuters further reported that the transferred individuals were being held at Matsapha Correctional Complex, and that only two of the twenty-nine individuals had subsequently been released through repatriation to their countries of origin. [2]

24. The Associated Press similarly reported that the newly arrived transferees were expected to be housed at Matsapha Maximum Security Prison while Eswatini determined their future disposition. The report further noted that the Government of Eswatini had not publicly disclosed the legal status of the transferees, the duration of their anticipated detention, or the detailed terms governing the bilateral arrangement with the United States. Human rights organizations and civic groups expressed concern regarding the lack of transparency, legal oversight, and procedural safeguards surrounding the transfers. [3]

25. Amnesty International has documented that the practice of detaining United States transferees at Matsapha Correctional Complex extends back to at least July 2025 and continued following additional transfers in October 2025 and March 2026. Amnesty further reported that the transferred individuals remained in detention, raised concerns regarding arbitrary detention, and emphasized continuing obstacles to confidential access to legal counsel notwithstanding subsequent litigation before the Eswatini courts.[4]

26. In my professional opinion, these reports establish several objective facts that are significant from a refugee protection perspective. First, recently transferred third-country nationals have reportedly been confined within a maximum-security correctional institution rather than processed through an ordinary refugee reception framework. Second, the publicly available reporting does not presently demonstrate that these individuals have been admitted into Eswatini's refugee determination system, granted lawful immigration status, or provided a clearly identifiable pathway toward durable legal protection. Third, the reported uncertainty regarding legal status, detention, and procedural safeguards raises substantial questions

---

[1] Reuters: Eleven more Trump deportees arrive in Eswatini from the United States, lawyer saysBy Tim Cocks, July 8, 2026, https://www.reuters.com/3fec1b0a85a0/world/africa/eleven-more-trump-deportees-arrive-eswatini-united-states-lawyer-says-2026-07-08

[2] Reuters: Eleven more Trump deportees arrive in Eswatini from the United States, lawyer saysBy Tim Cocks, July 8, 2026, https://www.reuters.com/3fec1b0a85a0/world/africa/eleven-more-trump-deportees-arrive-eswatini-united-states-lawyer-says-2026-07-08

[3] AP: Eswatini receives 11 people deported from the US as part of migration crackdown, BY NOKUKHANYA MUSI, BY July 9, 2026, https://apnews.com/article/migrants-deportation-us-eswatini-matsapha-africa-trump-668b0d82b39beaaad1724e640d8844a4

[4] Amensty: Eswatini: Supreme Court ruling on legal access offers limited relief for US deportees, April 10, 2026, https://www.amnesty.org/en/latest/news/2026/04/eswatini-supreme-court-ruling-on-legal-access-offers-limited-relief-for-us-deportees/

regarding the practical implementation of any assurances that Eswatini is presently capable of providing effective protection to involuntarily transferred third-country nationals.[5]

**V. Eswatini Does Not Maintain an Independent Judicial Asylum System or Demonstrate the Practical Capacity to Provide Effective Protection to Third-Country Transferees**

27. Although Eswatini has enacted refugee legislation and is a State Party to the principal international refugee instruments, refugee status determination remains an executive administrative process. Eswatini does not maintain an independent judicial asylum tribunal or court responsible for determining refugee claims. Rather, refugee protection decisions are made within an administrative framework, and the statutory National Refugee Appeals Board, intended to provide an administrative appeal, has reportedly not been operationalized. Accordingly, asylum seekers do not presently have access to an independent judicial merits determination of their protection claims within Eswatini's refugee system.[6]

28. Beyond the legal framework, I have identified no publicly available evidence demonstrating that third-country nationals recently transferred from the United States have been admitted into Eswatini's refugee determination system, registered as asylum seekers, granted lawful temporary immigration status, or afforded the procedural safeguards ordinarily associated with refugee status determination. Instead, the available reporting indicates that such individuals have been detained at Matsapha Correctional Complex while their legal status and future disposition remain uncertain.

**VI. UNHCR's Role Cannot Cure Deficiencies in Eswatini's Refugee Protection System**

29. Eswatini's ordinary refugee reception system is centered on the Malindza Refugee Reception Centre (MRRC), which serves as the principal reception and accommodation facility for asylum seekers and refugees entering the country through its established protection procedures. Publicly available information indicates, however, that the Center has long operated under significant resource constraints. Although designed to accommodate approximately 400 residents, humanitarian reporting indicates that it has frequently housed more than twice that number, resulting in overcrowding, shortages of shelter, sanitation, and health services, and increasing reliance upon international humanitarian assistance and relocation efforts to secondary facilities such as the Ndzevane Refugee Settlement.[7]

30. In my professional opinion, these conditions illustrate the limited capacity of Eswatini's existing refugee reception infrastructure even for individuals entering through the country's ordinary asylum procedures. More importantly, I have identified no publicly available evidence demonstrating that recent third-country transferees from the United States have been admitted into that refugee reception system at all. Rather, the available reporting indicates that

---

[5] *Id*

[6] Refugees Act, 2017 (EswatiniLII)**:** establishes the Committee, Appeals Board, and eventual High Court review https://eswatinilii.org/akn/sz/act/2017/15/eng%402017-12-22 | UNHCR Rights Mapping Platform: confirms that the Appeals Board "has yet to be operationalized." | UNHCR's 2024 South Africa Multi-Country Office Annual Results Report further notes that no progress was made in implementing Eswatini's 2023 Global Refugee Forum pledges, including operationalizing the Refugee Appeals Board and finalizing regulations under the 2017 Refugees Act, https://www.acnur.org/co/sites/default/files/2025-06/South%20Africa%20MCO%20ARR%202024.pdf

[7] SWZ: Population Movement - 11-2024 - Influx of migrants in refugee camp https://go.ifrc.org/field-reports/17364

such individuals have instead been detained at Matsapha Correctional Complex while their legal status and future disposition remain uncertain.

31. The presently available information does not demonstrate that recent third-country transferees from the United States have entered Eswatini's ordinary refugee reception and determination process. Rather, the available reporting indicates that such individuals have instead been detained at Matsapha Correctional Complex while their legal status and future disposition remain uncertain. In my opinion, this distinction is significant because the existence of a statutory refugee framework does not itself demonstrate that the framework is being utilized or is capable of providing effective protection to this distinct category of transferee.

32. Eswatini falls within the operational responsibility of the United Nations High Commissioner for Refugees (UNHCR) Multi-Country Office for South Africa, headquartered in Pretoria. UNHCR provides technical assistance, capacity building, protection monitoring, and support to Eswatini's refugee system. However, UNHCR does not administer Eswatini's refugee status determination process, confer lawful immigration status, authorize release from detention, or exercise governmental authority over immigration or refugee protection decisions.

33. Responsibility for providing refugee protection, lawful status, procedural safeguards, and protection against refoulement remains with the Government of Eswatini. Accordingly, the existence of UNHCR programming or technical support cannot, standing alone, demonstrate that Eswatini possesses the legal or practical capacity to provide effective protection to involuntarily transferred third-country nationals.

34. In my professional opinion, there is presently no publicly available evidence demonstrating that recent third-country transferees from the United States have been processed through UNHCR-supported refugee procedures, registered as asylum seekers with access to the statutory refugee determination process, or afforded any pathway to lawful immigration status through UNHCR involvement. The available reporting instead indicates continued detention at Matsapha Correctional Complex while their legal status remains uncertain.

35. The availability of international humanitarian assistance cannot substitute for the receiving State's obligation to provide an accessible, functioning, and effective system of protection.

## VII. General Human Rights Conditions and Treatment of LGBTQI+ Persons in Eswatini

### A. Eswatini’s Size, Governance, and Institutional Context

36. Eswatini is a small, landlocked kingdom in Southern Africa governed under a constitutional framework in which substantial executive authority remains vested in the monarchy. Although the country maintains a written Constitution, Parliament, and courts, executive authority remains highly centralized. International observers continue to characterize Eswatini as Africa's last absolute monarchy and have expressed longstanding concerns regarding restrictions on political participation, limitations on civil liberties, and the concentration of governmental authority. These institutional characteristics are directly relevant to assessing the availability of effective state protection because refugee protection ultimately depends upon

the capacity, independence, and willingness of state institutions to implement legal safeguards in practice.[8]

37. International governmental and human rights reporting has consistently documented concerns regarding arbitrary detention, excessive use of force by security services, restrictions on civil liberties, prolonged impunity for serious human rights violations, and deficiencies affecting the rule of law and institutional accountability. In my professional opinion, these general human rights conditions provide important context for assessing whether vulnerable individuals, including LGBTQI+ persons and non-Swazi nationals seeking protection, can reasonably expect effective state protection. Where concerns exist regarding the independence, accountability, and practical operation of state institutions generally, those concerns necessarily inform an assessment of whether those same institutions can provide meaningful protection to individuals facing heightened vulnerability because of their sexual orientation or immigration status.[9] [10]

**B. Policing, Detention, and Impunity**

38. International governmental and human rights reporting has consistently documented concerns regarding the conduct of Eswatini's security forces, including allegations of arbitrary arrest and detention, excessive use of force, torture and other cruel, inhuman or degrading treatment, and limitations on accountability for official misconduct. Human Rights Watch, Amnesty International, and the United States Department of State have all reported that serious allegations involving police and security personnel have frequently resulted in limited investigation or accountability, contributing to broader concerns regarding the rule of law and effective institutional oversight.

39. Available international reporting further recognizes that sexual and gender minorities may face heightened risks of physical and sexual violence while in detention or incarceration.[11]

40. Conditions within Eswatini's detention facilities have likewise been the subject of longstanding concern. Public reporting has identified overcrowding, inadequate medical care, sanitation deficiencies, and violence within correctional facilities, while more recent reporting concerning third-country transferees detained at Matsapha Correctional Complex has raised additional concerns regarding prolonged detention, uncertainty concerning legal status, and access to legal counsel. Although the circumstances of ordinary criminal detainees differ from those of asylum seekers or third-country transferees, the reported conditions remain relevant when evaluating the practical consequences of detention and the availability of effective state protection.

---

[8] HRW Eswatini 2025, https://www.hrw.org/world-report/2026/country-chapters/eswatin

[9] Amnesty Eswatini 2025, https://www.amnesty.org/en/location/africa/southern-africa/eswatini/report-eswatini

[10] U.S. Department of State: credible reports of arbitrary killings, torture, cruel treatment, restrictions on expression, and other systemic human rights concerns, ECOI Net: US Department of State, 2024 Country Reports on Human Rights Practices: Eswatini, https://www.ecoi.net/en/document/2128496.html

[11] Canaries in the Coalmines, An analysis of spaces for LGBTI activism in Swaziland https://theotherfoundation.org/wp-content/uploads/2017/06/Canaries_Swaziland_epub_Draft2_CB2.pdf

41. In my professional opinion, these general human rights conditions are directly relevant to the assessment of state protection available to LGBTQI+ persons and other vulnerable individuals. A person who experiences violence, threats, discrimination, or persecution must necessarily rely upon the same police, correctional, administrative, and judicial institutions whose independence, accountability, and practical operation have been repeatedly questioned by international observers. Accordingly, the assessment of effective protection cannot be separated from the broader institutional environment within which that protection is expected to operate.

**C. Societal Taboos, Stigma, and Pressure to Conceal** [12]

42. Eswatini is one of Africa's smallest countries, with a population of approximately 1.2 million people and a land area of approximately 17,364 square kilometers. Its population is comparatively homogeneous: most residents speak siSwati and identify as Swazi, with relatively small minority populations. Swazi society has historically been organized around extended family and kinship relationships, homesteads, clans, chiefdoms, and a hereditary monarchy. Traditional authorities continue to exercise significant influence in community governance, particularly in rural areas, where chiefdoms remain important administrative and social structures.

43. These structures are relevant to the circumstances of LGBTQI+ persons because identity, family belonging, social standing, land access, community participation, and personal support are often closely connected. Eswatini should not be portrayed as culturally uniform, and individual families, religious leaders, and traditional authorities may hold differing views. Nevertheless, available research conducted with Swazi LGBTQI+ persons describes a social environment in which departure from expected norms concerning gender, marriage, family, and sexuality may result in rejection, exclusion, or pressure to conceal. Research by the Other Foundation, prepared through engagement with Swazi LGBTQI+ individuals and organizations, found that LGBTQI+ persons had historically remained largely closeted and invisible and documented substantial deficits in family acceptance and support.

44. Religion also occupies a central place in public and private life. According to Eswatini's 2017 Population and Housing Census, approximately 89.25 percent of the population identified as Christian. Christian practice in Eswatini exists alongside, and may overlap with, traditional Swazi beliefs and institutions. Civil-society reporting prepared for Eswatini's Universal Periodic Review identified churches as common sites of discrimination based on sexual orientation and gender identity, including the reported suspension of a pastor following disclosure that he was bisexual. The influence of religious institutions is particularly relevant where family acceptance, community belonging, education, and access to social support may be mediated through churches and religious leadership.[13]

---

[12] From the Inside Out: Social exclusion linked to sexual orientation, gender identity and expression and sex characteristics in Esawatini, Malawi, Zimbabwe: https://www.southernafricalitigationcentre.org/wp-content/uploads/2022/11/From-the-Inside-Out-Social-Exclusion-Linked-to-Sexual-Orientation-Gender-Identity-and-Expression-and-Sex-Characteristics-in-Eswatini-Malawi-and-Zimbabwe.pdf | ILGA World Database , https://database.ilga.org/eswatini-lgbti |

[13] Comon Core Document for the Kingdom of Eswatini: https://gov.sz/images/justice/NMRF/Common-core-document--4-April-2022.pdf

45. Available public-opinion research confirms that negative attitudes toward homosexuality are widespread. In Afrobarometer's nationally representative 2015 survey, 57 percent of respondents in then-Swaziland stated that they would "strongly dislike" having a homosexual neighbor and another 16 percent stated that they would "somewhat dislike" doing so. Only approximately 6 percent expressed an affirmative preference for such a neighbor, while 21 percent stated that they would not care. Thus, nearly three-quarters of respondents expressed direct opposition to living beside a homosexual person. More recent compilations of Afrobarometer data reported by Equaldex similarly indicate markedly greater intolerance than acceptance, although the precise percentage varies by survey round.[14]

46. Same-sex relationships and LGBTQI+ identities remain subject to significant social stigma in Eswatini. Available country information describes a social environment in which same-sex relationships are frequently viewed as immoral, inconsistent with Swazi custom, or incompatible with prevailing religious and cultural expectations concerning marriage, gender, and family. The United States Department of State reports that societal discrimination against LGBTQI+ persons remains a significant concern; that LGBTQI+ persons often conceal their sexual orientation or gender identity; that individuals who are open about their identity face censure and exclusion from the chiefdom-based patronage system; and that traditional, religious, and government officials have publicly characterized same-sex conduct as immoral. The Department further reports discrimination in employment and healthcare, together with restrictions on freedom of association affecting LGBTQI+ organizations.[15]

47. These findings are consistent with research undertaken by the Other Foundation, which documented that LGBTQI+ persons in Eswatini have historically remained largely invisible because of stigma and fear of disclosure. The report observed that senior public officials had, at times, publicly denied the existence of LGBTQI+ persons in the Kingdom, while local LGBTQI+ organizations described particularly hostile attitudes and hate speech in some rural communities.[16]

48. The practical difficulties confronting LGBTQI+ persons extend beyond social stigma to the ability of civil society organizations to advocate for equal rights and legal recognition. In a June 2026 analysis of ongoing litigation involving the registration of Eswatini Sexual and Gender Minorities (ESGM), Daily Maverick observed that "this is a hard fight against a government and king who believe LGBTI people have no place in the kingdom and who are trying to restrict the power of civil society organisations." The article describes ESGM's years-long litigation to secure legal recognition, notwithstanding a favorable 2023 Supreme Court ruling, and concludes that the organization continues to face governmental resistance grounded in assertions that Swazi customary law does not recognize same-sex relationships. In my

---

[14] Afrobarometer, Round 6, Dispatch # 74: 2016, https://www.afrobarometer.org/wp-content/uploads/2022/02/ab_r6_dispatchno74_tolerance_in_africa_eng1.pdf
[15] ECOI: U.S. State Department , 2023 Country Report on Human Rights Practices: Eswatin, https://www.ecoi.net/en/document/2107689.html
[16] Canaries in the Coalmines, An analysis of spaces for LGBTI activism in Swaziland https://theotherfoundation.org/wp-content/uploads/2017/06/Canaries_Swaziland_epub_Draft2_CB2.pdf

opinion, this continuing litigation illustrates that even organized civil-society efforts to secure basic legal recognition and freedom of association remain contested in Eswatini.[17]

49. These attitudes have practical consequences. Research conducted with LGBTQI+ persons in Eswatini has documented family rejection, social isolation, discrimination in employment and housing, harassment, exclusion from religious communities, and barriers to healthcare. The Other Foundation reported that many LGBTQI+ persons relied upon private or anonymous social-media networks to meet, organize, obtain information, and report experiences of harassment or discrimination. The importance of anonymity in those communications reflects the risks associated with open identification in ordinary social and community settings.

50. In my professional opinion, the resulting pressure to conceal sexual orientation must not be interpreted as evidence that violence and discrimination are uncommon. In a small and closely interconnected country, where family, religious, traditional, and community structures remain influential, disclosure may carry consequences extending across multiple areas of life. LGBTQI+ persons may avoid reporting abuse, approaching the police, seeking healthcare, forming open relationships, or moving openly within their communities because disclosure may result in rejection, loss of housing or livelihood, humiliation, violence, or further victimization.

51. These characteristics are also relevant to any later assessment of internal relocation. Urban anonymity may provide some individuals with greater personal space than a rural chiefdom, but the existence of Mbabane or Manzini does not establish a socially or legally protected enclave for LGBTQI+ persons. Eswatini’s limited geographic size, comparatively small population, closely connected social networks, national criminal law, and absence of comprehensive anti-discrimination protection materially limit the proposition that a gay man—particularly a conspicuous foreign national without family, community, or secure legal status—could simply relocate within the country and thereby avoid the conditions described above.

**D. Criminalization and Absence of Protective Legislation [18]**

52. Consensual same-sex sexual conduct between men remains criminalized in Eswatini through the continued recognition of the colonial-era common law offence of sodomy. Although the precise sentence applicable to the offence is uncertain and recent prosecutions appear to be uncommon, the offence has never been repealed and continues to form part of Eswatini's criminal law. The United States Department of State likewise reports that common law is understood to criminalize sodomy in Eswatini, while Human Dignity Trust classifies Eswatini among the African jurisdictions that continue to criminalize consensual same-sex intimacy between men. [19]

53. The continuing legal recognition of the offence is also reflected within Eswatini's criminal procedural framework. The Criminal Procedure and Evidence Act continues to refer expressly

---

[17] Daily Maverick, THE PURSUIT OF JUSTICE Eswatini’s civic freedoms on trial in landmark LGBTI rights legal battle, By Khanyo Farisè, June 22, 2026, https://www.dailymaverick.co.za/article/2026-06-22-eswatinis-civic-freedoms-on-trial-in-landmark-lgbti-rights-legal-battle/

[18] ILGA World Database | Human Dignity trust, Eswatini

[19] Document #2107689 USDOS – US Department of State 2023 Country Report on Human Rights Practices: Eswatini | https://www.ecoi.net/de/dokument/2107689.html

to prosecutions for sodomy and assault with intent to commit sodomy, authorizes arrest without warrant for sodomy, and provides that a person charged with sodomy or assault with intent to commit sodomy may be convicted of the lesser offence of indecent assault where supported by the evidence. The continued inclusion of these provisions confirms that sodomy remains a recognized criminal offence within Eswatini's legal system notwithstanding the apparent rarity of recent prosecutions. [20]

54. Equally significant is what Eswatini's legal framework does not provide. The law does not prohibit discrimination based upon sexual orientation, gender identity, or gender expression by either state or non-state actors. Nor does it recognize same-sex relationships or provide LGBTQI+ persons with legal protections comparable to those afforded other protected groups. Consequently, LGBTQI+ persons who experience discrimination, violence, eviction, denial of employment, or exclusion from public life generally lack explicit statutory protections based upon their sexual orientation or gender identity.[21]

55. In my professional opinion, the significance of criminalization extends well beyond the prospect of formal prosecution. Laws criminalizing consensual same-sex intimacy contribute to an environment in which prejudice is legitimized, discrimination is reinforced, and victims may reasonably fear reporting violence or seeking assistance from police or other state authorities. Human Dignity Trust has observed that, even where such laws are infrequently enforced, their continued existence underpins broader patterns of discrimination and violence against LGBTQI+ persons. In my opinion, the continued criminalization of consensual same-sex conduct therefore remains highly relevant when assessing whether a gay man can realistically expect effective state protection in Eswatini.[22]

56. Criminalization of same-sex relations does more than authorize state enforcement through arrest or prosecution. Such laws also legitimize social hostility and signal to the broader public that individuals perceived to be Lesbian, Gay, Bisexual, or Transgender are criminals whose mistreatment is to be tolerated. As a result, criminalization often facilitates abuse not only by state authorities but also by family members, community actors, and vigilante groups who believe they are justified in enforcing prevailing moral or legal norms.

The United Nations Special Rapporteur on Torture has specifically recognized this dynamic. In a report interpreting the obligations of states under the Convention Against Torture, Special Rapporteur Juan E. Méndez explained that the criminalization of homosexuality and other discriminatory laws targeting LGBT individuals contributes to violence and impunity:

> "States are complicit in violence against women and lesbian, gay, bisexual and transgender persons whenever they create and implement discriminatory laws that trap them in abusive circumstances"

---

[20] Criminal procedure and Evidence Act, Act 67 of 1938, https://eswatinilii.org/akn/sz/act/1938/67/eng%401998-12-01
[21] Supra
[22] Human Dignity trust, https://www.humandignitytrust.org/lgbt-the-law/

> "(Criminalizing) laws foster a climate in which violence against lesbian, gay, bisexual and transgender persons by both State and non-State actors is condoned and met with impunity." [23]

The former Independent Expert for SOGIESC to the United Nations, Victor Madrigal-Borloz, noted in his reporting:

> "There is no room to argue for legal justification of criminalization of same-sex relations . . . Criminalization creates an incentive for persecution." [24]

**E. The Absence of Recent Prosecutions Does Not Demonstrate Safety [25]**

57. It has been asserted in governmental and public reporting that prosecutions for consensual same-sex conduct in Eswatini have been infrequent or absent in recent years. While I do not dispute that recent reported prosecutions appear to be uncommon, I do not regard that fact, standing alone, as demonstrating that LGBTQI+ persons enjoy effective protection or meaningful safety. In my professional opinion, the frequency of prosecutions is only one factor in assessing risk and, by itself, provides an incomplete picture of the lived realities experienced by LGBTQI+ persons. The United States Department of State similarly reports that LGBTQI+ persons continue to conceal their sexual orientation or gender identity and experience discrimination and social exclusion notwithstanding the apparent absence of recent prosecutions. *(U.S. Department of State, 2023 Human Rights Report).*

58. Criminal laws need not be regularly enforced through formal prosecution in order to have profound legal and practical consequences. The continued existence of laws criminalizing consensual same-sex intimacy reinforces societal stigma, legitimizes discrimination, and signals that LGBTQI+ identities remain inconsistent with the legal and moral expectations of the State. Human Dignity Trust has observed that the continued existence of such criminalizing laws itself underpins broader patterns of discrimination against LGBTQI+ persons, irrespective of the frequency of prosecutions. Rather than demonstrating safety, the absence of prosecutions may itself reflect the extent to which LGBTQI+ persons conceal their identity, avoid state institutions, and refrain from reporting abuse in order to reduce the risk of exposure.[26]

59. In my professional experience researching country conditions throughout Africa, criminalization frequently facilitates arbitrary policing, intimidation, blackmail, and extortion, even where prosecutions themselves remain relatively uncommon. Police officers or other officials may invoke the existence of criminal sanctions to threaten arrest, solicit bribes, or

---

[23] UN Special Rapporteur on Torture confirms that criminalising LGBT people leads to violence and impunity, https://www.humandignitytrust.org/news/un-special-rapporteur-on-torture-confirms-that-criminalising-lgbt-people-leads-to-violence-and-impunity/?

[24] *Newsweek:* 71 Countries Where Homosexuality is Illegal, Acceptance of the LGBT community continues to spread around the world, but homosexuality is still illegal in many parts of the world. By Daniel Avery, April, 04, 2019, https://www.newsweek.com/73-countries-where-its-illegal-be-gay-1385974

[25] U.S. State Department Document #2107689 USDOS – US Department of State2023 Country Report on Human Rights Practices: Eswatini| Human Dignity Trust reporting, https://www.humandignitytrust.org/country-profile/eswatini

[26] *Id*: Human Dignity Trust, Eswatini Country Profile; U.S. Department of State, 2023 Human Rights Report

discourage complaints, while private individuals may similarly exploit criminalization through threats of exposure or false accusations. Consequently, the practical effects of criminalization often extend well beyond the courtroom and contribute to an environment in which abuse may occur with diminished accountability. Victims who reasonably fear exposure or criminal suspicion are significantly less likely to seek police protection or pursue legal remedies, further masking the true extent of violence and discrimination experienced by LGBTQI+ persons.

60. This distinction is particularly significant in Eswatini, where the available country information demonstrates continuing social stigma, the absence of comprehensive anti-discrimination protections, and the continued criminalization of consensual same-sex conduct between men. These factors operate cumulatively. The relevant question is therefore not simply whether prosecutions occur, but whether a gay man can reasonably expect to live openly, seek protection from the authorities when threatened, report crimes without fear of reprisal, and enjoy equal access to state institutions without his sexual orientation exposing him to discrimination, hostility, arbitrary treatment, or adverse legal consequences.

61. In my professional opinion, the presently available evidence does not support such a conclusion. Rather, the combination of continuing criminalization, widespread societal stigma, limited legal protections, and broader concerns regarding the effectiveness and accountability of state institutions indicates that the absence of recent prosecutions should not be interpreted as evidence that LGBTQI+ persons in Eswatini are free from persecution, serious harm, discrimination, or the denial of effective state protection.

**F. Documented Harms, Violence, and Barriers to Protection**

62. Available governmental, academic, and civil society reporting documents that LGBTQI+ persons in Eswatini continue to experience violence, discrimination, harassment, and exclusion across multiple aspects of daily life. These harms extend beyond isolated incidents and include family rejection, physical violence, discrimination in employment and housing, barriers to healthcare, social exclusion, and threats based upon actual or perceived sexual orientation or gender identity. Although incidents are believed to be substantially underreported, the available evidence demonstrates that LGBTQI+ persons continue to face significant risks of harm arising from both private actors and broader societal discrimination.[27]

63. The United States Department of State has cited research indicating that approximately 60 percent of LGBTQI+ respondents in Eswatini reported having experienced violence during their lifetime, while approximately 25 percent of lesbian respondents reported having experienced sexual violence. These findings are consistent with reports documenting widespread discrimination and barriers affecting employment, education, healthcare, housing, and access to public services.[28]

64. Available reporting further demonstrates that violence and discrimination frequently remain unreported. Fear of exposure, family rejection, social ostracism, criminalization, and limited confidence in state institutions discourage many LGBTQI+ persons from approaching the police or seeking legal remedies. In my professional opinion, this pattern of underreporting

---

[27] *Supra*: U.S. Department of State, 2023 Human Rights Report; Human Dignity Trust; Other Foundation.
[28] *Id*

should not be interpreted as evidence that abuses are uncommon. Rather, it reflects the practical consequences of criminalization, stigma, and the absence of confidence that victims will receive effective state protection.

65. The challenges confronting LGBTQI+ persons are also reflected in the experience of Eswatini Sexual and Gender Minorities (ESGM), the country's principal LGBTQI+ advocacy organization. Although the Supreme Court ruled in 2023 that ESGM was entitled to registration, the organization's prolonged litigation illustrates the significant institutional resistance encountered by LGBTQI+ organizations seeking formal legal recognition and equal participation in public life. More recent reporting indicates that litigation concerning the organization's legal status and broader civic participation remains ongoing.[29]

66. In my professional opinion, these documented harms cannot be viewed in isolation. Rather, they demonstrate that LGBTQI+ persons in Eswatini continue to face cumulative risks arising from criminalization, entrenched social stigma, institutional discrimination, and barriers to obtaining effective protection from state authorities. Those risks become significantly greater where, as here, the individual is not only a gay man but also a foreign national involuntarily transferred to Eswatini without established lawful immigration status, family support, or demonstrated access to the country's refugee protection system.

**G. UPR and International Findings [30]**

67. The concerns described above are consistent with the observations and recommendations made during Eswatini's most recent Universal Periodic Review ("UPR") before the United Nations Human Rights Council. During that process, United Nations Member States and civil society organizations raised concerns regarding the continuing criminalization of consensual same-sex conduct, violence and discrimination directed toward LGBTQI+ persons, barriers to access to justice, and the absence of comprehensive legal protections based upon sexual orientation and gender identity.[31]

68. Civil society submissions prepared for the UPR documented continuing discrimination affecting LGBTQI+ persons in healthcare, employment, housing, education, and religious institutions, together with reports that many individuals concealed their sexual orientation or gender identity because of fear of discrimination, violence, or social exclusion. Those submissions further recommended repeal of laws criminalizing consensual same-sex conduct and the enactment of effective anti-discrimination protections.[32]

69. Although Eswatini accepted certain recommendations directed toward combating violence and discrimination generally, it did not undertake to repeal the criminalization of consensual same-sex conduct or enact comprehensive legal protections based upon sexual orientation or gender identity. Accordingly, the principal structural concerns identified by the international

---

[29] Supreme Court of Eswatini; Daily Maverick, June 2026.
[30] ILGA World, *39th UPR Working Group Session: SOGIESC Recommendations* (January 2024).
https://ilga.org/wp-content/uploads/2024/01/39th_UPR_working_group_session_SOGIESC_recommendations.pdf
[31] United Nations Human Rights Council, UPR; ILGA UPR Compilation.
*[32]* Rock of Hope; Joint Stakeholder Submission; UPR Documentation.

community, including criminalization, discrimination, and inadequate legal protection—remain substantially unchanged. [33]

70. In my professional opinion, the findings of the Universal Periodic Review are significant because they are broadly consistent with the conclusions reached by the United States Department of State, Human Rights Watch, Amnesty International, Human Dignity Trust, and other independent sources reviewed in preparing this affidavit. Taken together, these sources present a consistent picture of continuing legal, institutional, and societal barriers affecting LGBTQI+ persons in Eswatini and do not support the conclusion that a gay man transferred involuntarily to Eswatini can presently expect effective state protection.

H. No Demonstrated Safe Internal Relocation

71. In my professional opinion, the presently available evidence does not demonstrate that internal relocation within Eswatini would provide a realistic or durable means of avoiding the risks described in this affidavit. Although Eswatini contains urban centers such as Mbabane and Manzini, the existence of larger population centers does not establish the availability of a location where a gay man can safely live openly while enjoying effective state protection. The continued criminalization of consensual same-sex conduct between men, the absence of comprehensive anti-discrimination protections, persistent societal stigma, and documented barriers to obtaining police protection and equal treatment are national conditions rather than localized phenomena.

72. Eswatini is a comparatively small kingdom with a population of approximately 1.2 million people whose population is predominantly ethnic Swazi and whose social structures remain closely connected through extended families, clans, chiefdoms, traditional authorities, and religious communities. In such an environment, social integration frequently depends upon family, kinship, and community relationships. A foreign national who lacks those traditional social structures, family networks, or community connections is likely to experience heightened vulnerability and social isolation. In my professional opinion, those circumstances materially diminish the proposition that relocation within Eswatini would provide meaningful safety or long-term integration.

73. These considerations are particularly relevant to the Respondent. Based upon the information available to me, he is a gay man, born in Jamaica in 1980, who is not a citizen or national of Eswatini and has no demonstrated lawful immigration status, family, clan, community, or other established social support within the country. To the extent he is unmarried, that circumstance may itself invite questions within a society in which heterosexual marriage remains a strong social expectation for adult men. His status as a foreign national, unfamiliar with Swazi family and community structures, further distinguishes him from individuals who may rely upon extended family networks or traditional community support during periods of hardship.

---

[33] United Nations Human Rights Council, Report of the Working Group on the Universal Periodic Review: *Eswatini*, U.N. Doc. A/HRC/49/14 (7 Jan. 2022) https://digitallibrary.un.org/record/3957795 | National Report (Government of Eswatini A/HRC/WG.6/39/SWZ/1 (27 Aug. 2021) | OHCHR Compilation of UN Information A/HRC/WG.6/39/SWZ/2 (23 Aug. 2021) | Summary of Stakeholders' Submissions A/HRC/WG.6/39/SWZ/3 (13 Aug. 2021) | Outcome Report A/HRC/49/14 (7 Jan. 2022)

74. These vulnerabilities do not exist independently. Rather, they intersect and reinforce one another. The Respondent would arrive not merely as a gay man, but as an involuntarily transferred third-country national, reportedly without lawful immigration status, without recognized refugee status, without demonstrated admission into Eswatini's refugee determination system, without family or community support, and without any publicly identified pathway toward durable legal status. Each of these factors independently increases vulnerability; collectively they create a substantially heightened risk of social isolation, detention, discrimination, exploitation, and the inability to obtain effective protection from state institutions.

75. In my professional opinion, the cumulative effect of these intersecting vulnerabilities distinguishes the Respondent from an ordinary resident or even from an ordinary asylum seeker arriving voluntarily in Eswatini. I have identified no publicly available evidence demonstrating that Eswatini presently possesses an operational framework capable of receiving, protecting, and integrating a gay, non-Swazi third-country transferee removed by the United States under the circumstances presented here. Accordingly, the presently available evidence does not support the conclusion that internal relocation or transfer to Eswatini would provide the Respondent with effective protection, durable legal status, or a realistic opportunity to live safely and openly without a well-founded fear of serious harm.

## VIII. APPLICATION OF COUNTRY CONDITIONS TO THE RESPONDENT'S PARTICULAR CIRCUMSTANCES

76. The country conditions described throughout this affidavit must ultimately be assessed in light of the Respondent's individual circumstances. Country conditions, standing alone, do not determine risk. Rather, the relevant inquiry is whether those conditions, when applied to the Respondent's particular characteristics and circumstances, create a reasonably foreseeable risk of persecution, serious harm, or the denial of effective protection.

77. Based upon the information made available to me, the Respondent is a gay man born in Jamaica in 1980. He is not a citizen or national of Eswatini, has no known family members, clan affiliation, community connections, employment history, property, or lawful immigration status within Eswatini, and has no demonstrated support network capable of assisting his integration or protection upon arrival. To the best of my knowledge, he is unmarried and has no children. There is also no indication that he speaks siSwati, the principal language of Eswatini, or that he possesses the linguistic or cultural familiarity necessary to navigate government institutions, refugee procedures, healthcare, employment, or daily life without assistance. These circumstances significantly distinguish him from individuals who possess established social, familial, or community ties within Eswatini.

78. As discussed above, Eswatini's comparatively small population, close-knit community structures, strong traditional expectations concerning family and marriage, continuing criminalization of consensual same-sex conduct between men, and documented societal stigma toward LGBTQI+ persons materially increase the vulnerability of a foreign national who lacks family or community support. In my professional opinion, the Respondent's status as both a non-Swazi national and an openly gay man would likely increase his visibility and social isolation, while reducing the practical availability of informal support networks upon which many residents depend.

79. I further understand that the Respondent has a United States criminal conviction arising from consensual sexual activity with a male who was approximately sixteen to seventeen years old. I express no opinion regarding the legal characterization of that conviction under United States law or whether it ultimately falls within Eswatini's exclusion provisions. However, under Eswatini's Refugees Act, 2017, applicants for refugee status are subject to exclusion where there are serious reasons to believe they have committed a serious non-political crime outside Eswatini prior to admission as a refugee, and refugee status determination procedures require consideration of potential exclusion issues. Accordingly, if the Respondent seeks refugee protection in Eswatini, his criminal history would ordinarily be subject to disclosure during refugee or immigration processing, and is likely to become a material aspect of the refugee status determination process and may subject him to heightened scrutiny by the authorities.

80. Beyond any legal implications, I am concerned about the practical consequences if the circumstances of the Respondent's conviction become known to government officials or members of the public. In my professional opinion, within the social and legal environment described throughout this affidavit, a conviction involving same-sex sexual conduct with an adolescent male is likely to be viewed through the combined lens of criminalization, entrenched societal stigma toward homosexuality, and strong traditional and religious attitudes concerning sexuality and youth. Regardless of the precise legal characterization of the offense in the United States, disclosure of those circumstances would likely reinforce existing prejudice against the Respondent, increase the risk that he would be perceived as a danger to children or young people, heighten hostility from members of the community, and further diminish his ability to obtain effective protection or meaningful social integration.

81. These factors must be considered cumulatively rather than individually. The Respondent would arrive in Eswatini as a gay man, transferred involuntarily to a third-country, a national without demonstrated lawful status, without family or community support, without a demonstrated pathway into Eswatini's refugee protection system, and carrying personal characteristics likely to heighten social stigma if disclosed. In my professional opinion, these intersecting vulnerabilities substantially increase the likelihood that he would be unable to obtain effective state protection, durable legal status, or safe integration within Eswatini and substantially increase the likelihood that he would be unable to obtain effective state protection, durable legal status, or safe integration within Eswatini.

**IX. OPINIONS**

82. Based upon my review of the available country information, Eswatini's legal framework, United Nations documentation, United States Department of State reporting, reports of international and regional human rights organizations, and my professional experience researching refugee protection systems and LGBTQI+ country conditions throughout Africa, it is my professional opinion, stated to a reasonable degree of expert certainty, that the presently available evidence does not demonstrate that Eswatini possesses the legal, institutional, or practical capacity to provide effective protection to an involuntarily transferred third-country national in the Respondent's circumstances. Although Eswatini has enacted refugee legislation and maintains a formal refugee framework, the available evidence does not demonstrate that recent third-country transferees have been admitted into that system, afforded meaningful access to refugee procedures, granted lawful status, or provided a durable pathway to

protection. Rather, the available evidence indicates continuing uncertainty concerning legal status, detention, and procedural safeguards.

83. It is further my professional opinion that the Respondent's individual circumstances materially increase his vulnerability upon transfer. He would arrive in Eswatini as a gay, non-Swazi national with no family, clan, community, or social support network, no demonstrated lawful immigration status, and no established pathway into Eswatini's refugee protection system. The continued criminalization of consensual same-sex conduct between men, widespread societal stigma, the absence of comprehensive legal protections, documented deficiencies in effective state protection, and the additional scrutiny likely arising from his criminal history operate cumulatively rather than independently. In my opinion, these intersecting characteristics substantially heighten his risk of discrimination, detention, social exclusion, exploitation, and the inability to obtain meaningful protection from state authorities.

84. Accordingly, it is my professional opinion, stated to a reasonable degree of expert certainty, that the presently available evidence does not support the conclusion that Eswatini can presently provide the Respondent with effective protection equivalent to that contemplated under international refugee protection principles. Rather, the available evidence demonstrates a substantial risk that he would face legal uncertainty, barriers to refugee protection, heightened vulnerability arising from his sexual orientation and personal circumstances, and the absence of a demonstrated, durable pathway to lawful status, safety, and effective state protection. Taken cumulatively, these conditions create a reasonably foreseeable risk that the Respondent would be exposed to discrimination, social exclusion, arbitrary detention, abuse, violence, exploitation, or other serious harm without effective recourse to state protection. These risks arise not from any single characteristic viewed in isolation, but from the cumulative interaction of the Respondent's sexual orientation, foreign nationality, lack of lawful status, absence of social and family support, and the practical deficiencies in Eswatini's refugee protection system described throughout this affidavit.

DATED on this the 11th day of JULY, 2026.

_______________________________

**MELANIE NATHAN** B.A. LL.B
commissionermnathan@gmail.com
Tel: 415.601.1099

**ADDENDUM A:**

**Curriculum Vitae**
**Melanie Nathan**
**nathan@africanHRC.org**

**African Human Rights Coalition -** Executive Director, U.S.A. | South Africa (2014-Current)

**Publication:** Advocacy Online Publisher, AfricanHRC News (2009-Current)

**Mediator, Human Rights Advocate, Consultant U.S.A.**

- Private Courts Inc. - (2005-Current)
- Megila Mediation - (2000-2005)
- Nathan & Associates - (1985-2000)

**Attorney, South Africa**

- Singer Horwitz, Attorney (1981-1984)
- Favish & Barrable, Articles of Clerkship (1979-1981)

**SA Law Society**, Bar Exam & Attorney Admission to Supreme Court of South Africa (1980)

**Internships:**

- University of Witwatersrand (WITS) Campus Law Clinic (1979)
- Urban Training Project (1977-1978)

**Education:**

- University of Witwatersrand - B.A. (Law) LL.B (1979)
- University California, Berkeley - Mediation Certification in Conflict Resolution

**Director of Non-Profit Projects**

- Peacemaker Museum, World Tour - Nobel Peace Prize Institute, Mandela Foundation, SAGCE - (2013-2018)
- San Francisco Africa Leadership Institute (SFALI) - (Fiscal Sponsor: San Francisco LGBT Community Center) (2014)
- Relief Fund Campaign - Africa LGBTI+ Relief Fund (2013-2015)

**Appointments, Elected, Honors, Boards & Commissions**

- Board Member: New Conservatory Theater Center, San Francisco (NCTC) (2020-Current)
- Appointed to Board of Review, City of San Anselmo (2018-2021)
- Appointed to Marin County Youth Court Restorative Justice Bench (2018-2020)

- L-Project City West Hollywood Sponsored Women's Freedom Award 2022
- Elected Vice President Board, San Francisco Pride (2015-2018)

- Marin County Human Rights Commission's Rev. Dr. Martin Luther King Jr. Award
- Humanitarian Award for outstanding effort and advocacy in the furtherance of human rights. (2016)
- Goodwill Ambassador, Kentucky Federation Award (2016)
- Community Grand Marshall for San Francisco Pride, in recognition of global LGBTI+ advocacy work and activism, (2014)
- Appointed by Marin County Board of Supervisors to Marin County Human Rights Commission (2006-2012)
- Grand Marshal, Cape Town Pride, (2011)
- Vice President of Board Fair Housing Advocates of the North Bay (2002-2009)

**Country Conditions Reporting and Testimony: for LGBTQI+ Asylum Cases in United States, South Africa, Japan, Norway, United Kingdom, Iceland, and Sweden** for Angola, Burundi, Burkina Faso, Cameroon, DRC, Ethiopia, The Gambia, Ghana, Kenya, Guinea-Conakry, Equatorial Kenya, Kenya, Mauritania, Namibia, Niger, Nigeria, Uganda, Zimbabwe, Rwanda, South Africa, Senegal, Togo , Zambia. (2014-current)

**Testimony:** Senate Judiciary Committee (Senator Patrick Leahy, (D- VT)) for the hearing on the Uniting American Families Act (UAFA) (June 2009); Testimony in California Assembly and Senate for a Resolution in support of UAFA (2010)

**Selected Conferences, Panels, and Formal Presentations:** Presenter, U.S. Department of Housing and Urban Development, President Obama's Commission on Discrimination Against LGBT People in Housing (2010); Presenter, South African Parliament, invited by Minister of Justice Hon. Jeff Radebe, on drafted reforms addressing homophobia and so-called "corrective rape," contributing to the formation of a Government–Civil Society Task Team (2011); Workshop Presenter, Creating Change Conference (2011, 2012); Presenter and Panel Chair, Southern Africa HIV and AIDS Information Dissemination Service (SAfAIDS), alongside former President Joaquim Chissano, Justice Edwin Cameron (South African Constitutional Court), parliamentarians, UNAIDS, and African Union representatives (2015); Speaker, University of the Witwatersrand Law Clinic and Nelson Mandela Bay Metropolitan University speaking tour (2015); Presenter, Distinguished Lecture Panel, Center for African Peace and Reconciliation, University of California, Davis, Sacramento, with Hon. Justice Jacqueline Kamau, Kenyan High Court (2016); Organizing Committee Member and Thematic Working Table Lead, UNHCR Global Roundtable on Protection and Solutions for LGBTI+ Q+ People in Forced Displacement (2021), with participation in the Geneva update (2023); Panelist, UNHCR Monthly Consultation, "NGOs and the Protection of LGBTI+ Q+ People in Forced Displacement" (2021); Closing Keynote Speaker, International Human Rights Conference: Summit on LGBTQI Refugees and Asylum Seekers, World Pride, Malmö/Copenhagen (2021); Featured Participant, San Francisco Pride Mainstage presentation with UN High Commissioner for Refugees Dr. Filippo Grandi (2022); Guest Lecturer on LGBTI+ country conditions, San Francisco State University (since 2016); Lecturer, University of Iowa Center for Human Rights, "The Lion, the Waterhole and the Wallet" (2023); Keynote Speaker, Montreal Global Queer BIPOC Happening, Les Journées de la

Culture (2023); Workshop Presenter, University of Iowa Provost's Global Forum, "The Plight of Queers in the Great African Paradox" (2024); Author of opposition submission to Ghanaian Parliament, Constitutional, Legal and Parliamentary Affairs Committee, Family Values Bill (2022); Briefing Presenter to Canadian Parliamentarians on LGBTQI+ refugees displaced by criminalization (2023); Advisory Board Member, University of Birmingham research project on UK-Africa values and policy (since 2024); Presenter, Washington State Bar Association CLE Webinar on a World Court of Human Rights (2025).

**Regular Guest lecturer:** San Francisco State University (SFSU), 2 Semesters per annum, Women and Gender Studies: The Criminalization of LGBTQI+ Africans. (2016-current)

**Media:** The Advocate, Huffington Post**,** LGBTQ Nation, Florida Agenda, MS. Magazine, 76 Crimes, SDGLN, Agency France-Presse (AFP), British Broadcasting Corporation (BBC), *The Guardian*, VICE, National Public Radio (NPR), NBC, KPFA Radio, KOFY TV, *San Francisco Chronicle*, The Advocate, LA Progressive, The Washington Blade, The Los Angeles Blade, Longreads, Harpers, SDGLN, LGBTQ Nation, MS Magazine, Huffington Post, The New York Times, The Daily Journalist, Mercury News, Namibian News, Africa Today, Radio Today, South Africa (weekly contributor), MSNBC, Joy Reid Show.

**Feature Documentary:** UNSETTLED, Finding Refuge in America, CNN- Kenya Safe House featured in investigative report.