**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

**CONROY CONDECORE**
Petitioner,
v.

**TODD BLANCHE**, U.S. Attorney General, in his official capacity

**KELEI B. WALKER**, Orlando Field Office Director, **U.S IMMIGRATION AND CUSTOMS ENFORCEMENT**

**MARKWAYNE MULLIN**, Secretary, **DEPARTMENT OF HOMELAND SECURITY**,

**TODD LYONS,** Acting Director, **U.S IMMIGRATION AND CUSTOMS ENFORCEMENT**

**KEVIN GUTHRIE,** Executive Director, **SOUTH FLORIDA DETENTION CENTER / FLORIDA DIVISION OF EMERGENCY MANAGEMENT**

In their official capacities, Respondents.

Civil No. Agency No.:

2:26-cv-1704-SPC-NPM

A209-102-082

**NOTICE OF FILING EXPERT AFFIDAVIT**

**NOTICE OF FILING AFFIDAVIT OF ALMA DAVID IN SUPPORT OF PETITIONER'S OPPOSITION TO RESPONDENTS' MOTION FOR RECONSIDERATION**

Petitioner Conroy Condecore, by and through undersigned counsel, hereby gives notice of filing the attached Affidavit of Alma David (the “David Affidavit”), attached hereto as Exhibit B, in support of Petitioner's Opposition to Respondents' Motion for

Reconsideration of the Court's July 6, 2026 Order (ECF No. 25), filed by Respondents at ECF No. 24 on July 9, 2026.

Ms. David is an attorney who currently represents eleven third-country nationals removed from the United States to the Kingdom of Eswatini under the same Memorandum of Understanding and diplomatic assurances described in the Declaration of Christopher Landau (attached to Respondents' motion as Exhibit A). Ms. David's clients are among the individuals recently transferred to Eswatini and held at Matsapha Correctional Complex. Based on her direct, ongoing representation of these detained clients, including her firsthand communications with them and with Eswatini's Refugee Commissioner and UNHCR, the David Affidavit addresses: (1) that the only alternative presently available to her clients to Eswatini's Alternatives to Voluntary Return ("AVR") process is to remain unlawfully and indefinitely imprisoned in Eswatini; and (2) that this directly contradicts the diplomatic assurances described in the Landau Declaration, including the represented commitment to "access to asylum and protection systems" and the prevention of refoulement.

Petitioner submits the David Affidavit as direct, firsthand evidence, distinct from and corroborating the country-conditions opinions set forth in the Affidavit of Melanie Nathan, previously filed, that the diplomatic assurances on which Respondents rely are not being honored in practice, and that removal to Eswatini does not provide the access to asylum and protection systems Respondents represent to this Court.

A copy of the David Affidavit is attached hereto.

Respectfully submitted,

Dated: July 11, 2026

S/ Sasha Watson

SASHA WATSON (State Bar No. 42845)
HAWM, PLLC
641 N. Rio Grande Avenue
ORLANDO, FLORIDA 32805
Telephone: (407) 802-3223
Fax Number: (407) 377-1971
Primary E-Mail: swatson@hawmlaw.com
Secondary E-Mail: rdhaiti@hawmlaw.com
Attorney for Petitioner

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 4, 2026, a true and correct copy of the foregoing Declaration was filed with the Clerk of Court via CM/ECF and served on all counsel of record via the Court's electronic filing system and via direct email.

/s/ Sasha Watson
SASHA WATSON, ESQ.
Attorney for Petitioner

**AFFIDAVIT OF ALMA DAVID REGARDING THE CONSEQUENCES OF REMOVAL TO THE KINGDOM OF ESWATINI AS A THIRD COUNTRY**

I, **Alma David**, declare:

1. My name is Alma David, and I am an immigration attorney licensed in the United States. I am licensed by the State Bar of California (State Bar # 257676) and am admitted to practice before the Executive Office of Immigration Review, the Board of Immigration Appeals, and the Ninth Circuit Court of Appeals. I have been practicing immigration law exclusively since 2009.

2. Until February of 2025, my practice focused on asylum, removal (deportation) defense, and appellate work. Prior to moving to Montreal, Canada in 2017, I was an associate attorney and then a managing partner of a well-known removal (deportation) defense law firm in Seattle Washington (Rios & Cruz, now named Rios Immigration Defense). I was then a partner at another reputable immigration law firm in Seattle (Global Justice Law Group) before starting my own law firm with my business partner (Immigrant Advocacy and Litigation Center). Once I moved to Canada, I also served as Appellate Attorney for Prisoner Legal Services New York (PLSNY), an organization in New York State that provides legal representation to indigent prisoners, as well as to incarcerated New Yorkers who are facing deportation, unaccompanied immigrant children, and people detained and facing deportation in the Capital District and the North Country. Since 2021, I have been of counsel to Novo Legal Group, a U.S. law firm with offices in the states of Colorado and Washington.

3. Throughout my career, I have volunteered my services to various non-profit legal support organizations, such as the Northwest Immigrant Rights Project, the International Rescue Committee, Kids in Need of Defense, Al Otro Lado, the Immigrant Family Advocacy Project, the Federal Defenders of Eastern Washington, and others. I have held various leadership positions within the American Immigration Lawyers Association (AILA) and have been a speaker and panelist at a number of local, regional, and national AILA

conferences and events. As a result, I have had the opportunity to network with many members of the immigration bar, both private and not-for-profit, and I have developed collaborative relationships with many fellow immigration attorneys across the United States.

4. Since February 2025, I - in conjunction with other stakeholders - have been coordinating *pro bono* attorneys for the immigration detainees held at the U.S. Naval base at Guantánamo Bay. I do this work on a *pro bono* basis, and it consists primarily of recruiting experienced immigration attorneys to represent those immigration detainees, providing the attorneys with an orientation on representing individuals detained at Guantánamo, liaising between the volunteer attorneys and the American Bar Association Commission on Immigration and other NGOs involved in providing referrals for legal services, and being available to advise the volunteer attorneys on legal strategy or providing them with referrals to legal experts when my own knowledge is insufficient.

5. Since July of 2025, I have dedicated most of my time and energy to providing *pro bono* representation to individuals deported by the United States to so-called "third countries" – countries to which these individuals have no prior connections or ties. I have represented or currently represent men and women who have been deported to South Sudan, Eswatini, Equatorial Guinea, Cameroon, the Democratic Republic of Congo, and Central African Republic as third countries.

6. My work with the men and women deported to third countries has several components. My primary goal is always to identify one or more attorneys in the receiving country who is/are knowledgeable about local immigration, refugee, and human rights law and who is/are willing to attempt to gain access to the deportees, provide them with an overview of their legal rights in the country where they have been deported, and – if possible – represent them in any challenges they wish to bring to their detention, as well as in any pursuit of protection from deportation to their home countries if they fear persecution or torture there. Finding the attorney(s) willing to do this kind of work, especially in the context of the autocratic and un-free countries that the current administration has selected as its partners in third country deportation deals in Africa, requires consulting a number

of stakeholders in the academic, civil society/advocacy, and legal sectors, as does investigating where the deportees are detained and under what conditions. Thankfully, so far, I have been fortunate enough to have found extraordinarily brave, dedicated, and competent lawyers in all the countries where I have searched for them. These lawyers have not only been willing to donate their time and energy to an often grueling legal battle for the rights of men and women they have sometimes never even met, but who have steadfastly continued this work despite negative publicity and threats – ranging from veiled ones to explicit threats against their lives – because they understand that it is not just the rights of these men and women from far-flung lands that are stake, but also the integrity of human rights in their own countries.

7. In addition to identifying local legal support for my clients, my work often consists of advocating for their rights and interests and needs vis-à-vis the UN organizations often enmeshed in the arrangements between the United States and third country governments (the International Organization for Migration [IOM] and the United Nations High Commissioner for Refugees [UNHCR]), as they tend to be slow to be willing to recognize the local attorneys' representation.

8. I often act as the contact person for the deportees' family members and loved ones, who are often based in the United States and have many questions about how my clients could have ended up in countries where they have nothing and no one and how they may be able to return to the United States. Attempting to answer these questions requires into my clients' U.S. immigration (and in some cases, criminal) histories, so my work on that aspect of the cases consists of ordering and reviewing a variety of court and agency records, interviewing the clients and sometimes their family members or former attorneys.

9. As this phenomenon of third country deportations on a large scale is a very new one, there is no playbook and no established mode of handling these kinds of cases. It has therefore been my general attitude that the more insightful, experienced, and competent people are involved in trying to figure out how best to assist the deportees, the better.

Thus, I have made a point of reaching out to a broad variety of different organizations and individuals with expertise that is relevant to the situation and have fostered collaborative relationships with many of them, including Human Rights Watch, Human Rights First, Amnesty International, Refugees International, National Immigration Litigation Alliance, Asian Americans Advancing Justice, and others.

10. I have been interviewed about my work related to third country deportations by and cited in a number of media outlets, including the New York Times, the New Yorker Magazine, Canadian Broadcasting Corporation, Mother Jones, the Washington Post, the Wall Street Journal, El Pais, the Associated Press, Reuters, Agence France Presse, and many others.

11. I first became involved in working with the men deported to Eswatini n as a third country in July 2025, when the first cohort of third country deportees was sent there. I continue to represent the two men from that cohort, who are citizens of Cuba and Yemen, in addition to 8 others who have arrived in Eswatini since July 2025, who are citizens of Cuba, Haiti, Ethiopia, Somalia, Tanzania, and one who is stateless. I also represent one of the 11 men who were deported to Eswatini in July 2026, who is a citizen of Mauritania. I have also completed and scheduled intakes with five more of these 11 men and expect that several of them will become my clients.

12. It is difficult to explain how outrageous the situation is of the men deported to Eswatini as a third country without sounding hyperbolic. Despite never having committed or having been charged with a criminal offense in Eswatini, and despite the fact all of the men completed serving the time of incarceration they were sentenced to in the United States as the consequence of criminal convictions, the deportees are imprisoned in a maximum security prison in Eswatini: the Matsapha Correctional Centre. The government of Eswatini has provided no justification for this.

13. At Matsapha, they live four men to a small prison cell. Medical care at Matsapha is of very low quality, and if the men require medication they must pay for it themselves. The food at Matsapha is of extremely poor quality. Most days, the men are fed rice and cabbage or rice and watered down beans.

14. When the first cohort of deportees arrived, I – at the request of my clients' families - found a very respected lawyer, Sibusiso Nhlabatsi, who agreed to represent the men. However, the correctional authorities, at the behest of the government of Eswatini, refused to let him meet with them. It ultimately took ten months and a lawsuit that had to be litigated all the way to the Supreme Court of Eswatini just to get an order permitting the local lawyer to have a meeting with the men.

15. Even so, the men deported to Eswatini face two basic options: One is to accept an "Assisted Voluntary Return" (AVR) through the International Organization for Migration (IOM), which has been contracted by the Kingdom of Eswatini (though, according to the memorandum of understanding between the governments of the United States and Eswatini, it is the U.S. government that instructs them) to provide assistance to the deportees. If a deportee accepts AVR, IOM works with the government of his country of origin to obtain a travel document and then coordinates with the governments of his home country and of Eswatini to arrange for his repatriation, including travel to and reception in his home country.

16. Based on my direct involvement in these matters, my experience is that the only alternative presently available to my clients to IOM's AVR process is to remain unlawfully and indefinitely imprisoned in Eswatini. Indeed, after nearly a year of sustained advocacy and negotiation with UNHCR and the Refugee Commissioner of Eswatini, the Government of Eswatini agreed to permit some of the men to apply for refugee status. Notwithstanding that concession, the Refugee Commissioner has informed me directly that there is currently no indication from the Ministry of Foreign Affairs, Prime Minister's Office or King that a grant of refugee status to my clients will result in their release from Matsapha Maximum Security Prison. In other words, even successful recognition as a refugee under Eswatini's own domestic law will likely not lead to release from indefinite detention. prison.

17. This directly contradicts the diplomatic assurances on which the United States relies to justify third-country removal to Eswatini. The Landau Memorandum, which I have

reviewed, represents that Eswatini has committed to "act in accordance with its national laws and international obligations, including the 1951 Convention Relating to the Status of Refugees, the 1967 Protocol, and the 1984 Convention Against Torture, including the prevention of refoulement and access to asylum and protection systems." A refugee protection system in which the grant of refugee status carries no corresponding right to release from a maximum-security prison is not "access to asylum and protection systems" in any meaningful sense and, indeed, violates the 1951 Convention. Article 31 of the 1951 explicitly prohibits states from restricting refugees' freedom of movement once their status is regularized. Moreover, the consensus of the international community on the inherent undesirability of detention of refugees and asylum-seekers is reflected in Conclusion No. 44 (XXXVII) adopted by the UNHCR Executive Committee in 1986. Drawing upon the Conclusions of its Executive Committee and the relevant provisions of international law, UNHCR has elaborated detailed Guidelines setting out general principles and minimum standards of acceptable State practice relating to the detention of refugees and asylum-seekers. These Guidelines provide that as a general rule, refugees and asylum-seekers should not be detained. The assurances the Department of State has certified as credible and reliable are not being honored in practice, and my clients' experience demonstrates that they are not being afforded even the minimum protections. and where possible recognition of refugee status in Eswatini does not translate into the freedom from arbitrary detention that the diplomatic assurances represent.

18. Yet, because of those assurances and based on DHS' policy on third country removals, as detailed in the March 30 and July 9, 2025 guidance memoranda, none of the men deported to Eswatini was given more than a few hours (if that) notice of their removal to Eswatini and none of them was provided with the opportunity to be screened for a fear of persecution or torture in that country. As a consequence, among the latest cohort that arrived at Matsapha in July 2026 are (at least) two gay men and one transgender woman. In Eswatini, sexual intercourse between two men is illegal, which raises a significant question of whether the government of Eswatini could or would grant refugee status to an individual who faces persecution on account of his membership in the particular social group of gay men. Aside from this legal conundrum, according to a survey by Rock of

Hope, an organization that advocates for the rights of the LGBTQI+ community in Eswatini, in 2022 60% of that community reported having been subjected to violence.

19. AVR is not a realistic option for most of the deportees to Eswatini. This is because the majority of the deportees in the first and second cohorts are nationals of countries that are reluctant to issue them travel documents (Cuba, Laos, Vietnam, Cambodia) and the majority of the deportees in the third and fourth cohorts have been granted statutory withholding of removal or withholding/deferral of removal under CAT and are afraid to return to their home countries. Indeed, of the 30 men deported to Eswatini, only two have been repatriated to date: a Jamaican man who was deported to Eswatini in July 2025 and repatriated in September 2025, and a Cambodian man, who was deported to Eswatini in October 2025 and repatriated in March 2026. The others remain indefinitely imprisoned with no obvious prospect for change on the horizon, despite tireless efforts by those of us who represent the men for their release. Two of my clients will have been illegally imprisoned in Eswatini for an entire year on July 15, 2026.

20. Along with lawyers at the Global Strategic Litigation Council and the Cornell Law School Transnational Disputes Clinic, I filed a complaint against the Kingdom of Eswatini with the African Commission on Human and People's Rights (ACHPR) on behalf of two of my clients in Eswatini. In March 2026, the Commission agreed to allow the case to proceed. The outcome will not be known for many months or perhaps a year.

21. For now, my clients remain indefinitely incarcerated in Eswatini, with no freedom of movement, subject to difficult living conditions, and under constant surveillance by the Matsapha prison authorities.

Signed under pains of perjury, this 12th Day of July 2026.



______________________________

Alma David